We'll hear argument next in Case 10-694, Drulang v. Holder. Mr. Fleming. Mr. Chief Justice, and may it please the Court, in Hernandez-Casillas, the Attorney General confirmed that a lawful permanent resident subject to deportation must have the same opportunity to seek discretionary relief as an alien who has temporarily left this country and upon reentry been subject to exclusion. Two months later, in its published decision in Matter of Mesa, the BIA again confirmed that an immigrant deportable for an aggravated felony could seek relief because his conviction could also form the basis for excludability. Immigrants in situations indistinguishable from Mr. Judulang's applied for and received relief under this rule. The BIA's decision in Blake changed the law. Without explaining or even initially acknowledging that it was doing so, the Blake rule was impermissibly retroactive and it is arbitrary and capricious on its own merits. We would submit the evidence. Scalia. How do you explain? I mean, I think that is a principal point, whether Blake and Grieba changed the law. How do you explain the language in Matter of Wadood, which antedates by a good deal 1984, which says Section 212C can only be invoked in a deportation hearing where the ground of deportation charged is also a ground of inadmissibility? It seems to me that that's the basic point. Two responses to that, Justice Scalia. I agree. Matter of Wadood is the principal response that the government has and it does not help them at all. Wadood was deportable for a conviction under 18 U.S.C. 1546, and the BIA had held in a case called Matter of R.G. in 1958 that that conviction did not render him excludable. And that's confirmed later in the case of Matter of Jimenez-Santillano, which also involved a 1546 conviction, where the BIA says that if Mr. Jimenez had left the country and returned, it appears that he would not have been inadmissible and compares that situation to someone convicted of a firearms offense, which the Board and the Attorney General had always said were not waivable. To the extent there's any ambiguity in the language that Your Honor read, it could not have survived the Attorney General's decision in Hernandez-Casillas, which I just quoted at the beginning of the presentation, which said that what one looks to is whether the alien in exclusion proceedings would be able to invoke Section 212C relief. And when the Board then addressed the case of the aggravated felony in Matter of Meza, it did not even address Wadood or view it as binding at all. It looked to the conviction and whether it formed a basis for excludability. And the BIA then followed up with no fewer than eight decisions in crime of violence cases, indistinguishable from this case, where the BIA cited not Wadood, not any of the other cases that the government is relying on, but cited Meza as articulating the doctrine that the focus of analysis is on the conviction. And the Court has the briefs of several former immigration officials, including two INS general counsel and several INS trial attorneys, confirming that that was the position and the basis on which the government litigated these cases. And in fact, yes, Justice Kagan. Kagan. Kagan. Kagan. Kagan. If I may, I was just going to say that a number of these cases, crime of violence cases, reached the merits in both the BIA and the courts of appeals without the government even suggesting that there was a statutory counterpart problem. In fact, when it has suited its purposes, the government and the BIA have admitted that Blake was a change, including in a brief filed in the Ninth Circuit less than a year ago. Kagan. Kagan. Kagan. You cite some cases, you say there was a dramatic change in the law. The government cites some cases and it says there was no change in the law. What if the truth lies someplace in the middle? What if, in fact, when you look before Blake, what you see is some amount of confusion? That the board sometimes was following the Blake rule, but that on other times individual judges or maybe the board itself were doing something different because the individual circumstances suggested that they should, or just because they weren't so clear on the difference between these two approaches. And then Blake comes along, and what Blake does is neither to change something dramatically nor to just reaffirm what was there, but in some sense to create a little bit of order out of chaos. What would that do to your argument if that's the way one understood Blake? Obviously, Justice Kagan, we don't think that is the proper way to understand Blake. But to answer the question, for purposes of the retroactivity analysis, the Court uses what the Court in St. Cyr called considerations of fair notice, reasonable reliance, and settled expectations. And we would submit that reliance was more than reasonable and expectations more than settled as to how the board was addressing crime of violence, aggravated felony convictions prior to Blake, as is shown by the evidence that I cited a minute ago, namely the position that the government itself was taking in these cases and the way that immigrants would have been advised by both Criminal Defense Counsel and Immigration Counsel, including, for that matter, INS Trial Counsel. Scalia. Well, reliance on confused law is certainly not reasonable reliance. I mean, if you accept the premise that Justice Kagan operates from, how can you say that you're reasonably relying on confused law? I don't accept the premise at all, Justice Scalia, that the law was confused. That's a different point. But even if there was some lack of clarity in the law, and we don't think there was, I think the record before the Court is very clear that people were advised by competent counsel and that the government itself took the same position in front of the immigration courts and the courts of appeals, that someone with a crime of violence aggravated felony conviction could seek relief because that conviction would make him or her excludable, and the availability of relief in deportation proceedings is meant to be the same as it would be in exclusion proceedings. I understand the advice of counsel, but what is the reasonable expectation of that's been altered? The reasonable expectation that once someone pleads guilty, Mr. Chief Justice, to an excludable offense, one that would be waivable in exclusion proceedings, that a waiver may be sought in subsequent deportation proceedings on exactly the same basis. And that is the published policy of the United States. Roberts. Roberts. So you're saying the expectation is when he pleads guilty to a violent felony, that he expects, well, if I'm deported because of that, I'm going to be able to seek discretionary waiver? Yes, that's quite correct, Mr. Chief Justice. That's the ruling in St. Cyr, that when someone is — when someone pleads guilty to an offense that is eligible for relief under section 212C, there is reliance on the possibility, not a guarantee of a waiver, obviously, but the avoidance of mandatory deportation by appealing to the discretion of the attorney general. How often are these waivers granted? Quite frequently, I think. The Court pointed out in St. Cyr that they are frequent, and now, because the category of people who are eligible involves people who have very old convictions, they necessarily pled before 1996, they are usually minor convictions, they involve people who have been in this country for a long time, they frequently have property, they have families, they can show rehabilitation, often they only come to the attention of the immigration authorities by applying for naturalization or by renewing their green cards, and they get thrown into deportation on the basis of these old convictions that at the time of the plea would have been eligible for a waiver, and it is simply unfair to change the law, as Blake did, and oppose that change on people who relied on it in the beginning. Roberts, But in terms of the expectation interest, we have to visualize someone who is facing a serious charge and is entering a plea bargain, where presumably the consideration of what he's pleading to, how much of a sentence he's going to get, all that, are dominant considerations, and he's also going to say, well, I've been advised that I will be able to apply for a discretionary waiver, so I'm going to plead guilty. That's a fairly unlikely scenario, isn't it? On the contrary, Mr. Chief Justice. The Court in St. Cyr made very clear that's a very likely situation. It cited a couple of cases at that time that specifically involved that colloquy. The NIJC amicus brief, which is before the Court in this case, identifies a couple of situations, including the case of Mr. Ronald Bennett, who was advised by his lawyer that when he pled guilty, it would not be a problem for him for his immigration status, because he could seek 212c. Roberts, No, no, I'm not questioning the fact that he was advised, but presumably the lawyer will also advise him, oh, and you also have to pay the $250, you know, restitution, whatever fee. I'm just questioning how significant that advice will be when someone's determining whether to plead guilty or not to a violent felony. I understand, Mr. Chief Justice. It is quite significant for people whose ability to stay in this country is highly important to them. They have family here. They've lived here for decades. The risk that they're going to be here. And the violent felony in this case, he had a suspended sentence, didn't he? He was sentenced to time served, essentially, for this conviction. That's right. Now, if he had been convicted of a lesser offense that was not a crime involving moral turpitude, he would not be eligible for the waiver, isn't that right? If the offense would not have been waivable in exclusion proceedings, he would not be eligible. That's correct, Justice Sotomayor, but there might be other forms of relief. Isn't that strange? Suppose you have somebody who's charged with a lesser offense that doesn't involve moral turpitude and a greater offense that does, and the defense attorney comes to the client and says, I've got great news, the prosecutor will take a plea to the less, that would be bad, potentially bad advice, because he's got to plead to the more serious offense, because then he would be eligible for a waiver. He would be eligible for a waiver under Section 212c, Justice Alito, but that is not the only form of relief that someone who pleads guilty to a crime could potentially seek. And people who plead to non-inadmissible offenses, offenses that do not lead to their exclusion, had other avenues at the time that they could have pursued. For instance, they could have pursued adjustment of status. That's the BIA's decision in the matter of Gabrielski. In order to be to adjust status, all that matters is that you not be inadmissible to the country. And even if you are inadmissible, you can seek a 212c waiver during that process. Whether you're deportable or not doesn't matter. So there are many other ways. Looking at Section 212c on its own, it might appear anomalous, but looking at the immigration law as it was before 1986, there are other ways. Scalia's claim to say even further reduces the significance of the 212c possibility of waiver to the person pleading guilty. You are saying, yes, even though you couldn't get under 212c, there are a lot of other ways you might have gotten. I'm sorry, Justice Scalia. Maybe I wasn't clear. The people who could get the other relief are people who plead guilty to crimes that do not involve moral turpitude, which was Justice Alito's hypothetical. But people who plead to crimes involving moral turpitude potentially don't have that avenue open to them. But to them, Section 212c is very important and they could rely on its availability and dignity. But there's a large category of people who plead guilty to crimes that do not involve moral turpitude and yet are not otherwise excludable under 212c, right? I don't know which category Your Honor is thinking of. But certainly you can plead guilty to a crime that does not involve moral turpitude. Then you would not be eligible for Section 212c relief. But there might be some other way that you can get at it. But that is not this category of people. The category of people at issue here are people who pled before 1996 to aggravated felony crimes of violence, almost all of which, if not all of which, are going to be crimes involving moral turpitude that are excludable and therefore eligible for a waiver. It doesn't necessarily mean they'll get it, but it at least means they have the right to ask the Attorney General to exercise his discretion. And I'd submit that as this Court indicated in St. Cyr, the private interest in avoiding mandatory deportation is very strong. We have what I believe is a sudden and abrupt change in the law in Blake, and it could not have been foreseen. In fact, it wasn't foreseen by advocates on both sides of the V in these cases. The remaining question for purposes of the retroactivity analysis is only the strength of the agency's interest in applying the rule retroactively. I'd submit that that interest here is no stronger than it is in the ordinary mine run of cases, and in fact it is weaker, because all that we are talking about is the opportunity to submit an application for adjudication on the merits, which is subject to the discretion of the agency. Mr. Judelang would have the burden of convincing an immigration judge and the Board of Immigration Appeals that he deserves relief in the exercise of discretion. And so we can't really do that. Ginsburg. Ginsburg. When you say a sharp change, I think that this is a very confusing set of decisions. And the Wadoo case that was brought up before has a footnote that says that the Board had stated a waiver of inadmissibility may be granted in deportation if the alien was excludable as a result of the same facts, and then that footnote ends, we shall withdraw from that language in each of these cases. That's correct, Justice Ginsburg, and the operative language there is, as a result of the same facts. What Wadood was arguing was that recognizing that his conviction would not make him excludable because it was not a crime involving moral turpitude, he said, nonetheless, you should look to the facts of my conduct, because what I did was so turpitudinous that the government would surely have charged me as excludable. And the Board said, we are not going to do that, and to the extent our prior decisions suggested that, we are withdrawing from that language. It did not say, however, that the Board would not look to convictions to determine excludability, and in fact, in Mesa, which is after Wadood, it did just that. And when the Court came to crime of violence cases subsequently to that, the precedent that it relied on was Mesa, which focuses on the conviction. I agree it does not focus on the facts, but I don't think the language that Your Honor read undermines our position at all. Alitoso, that is so bizarre. It makes me that he's pleading to prove that what he did was really turpitudinous. It makes me think that maybe the en banc Ninth Circuit was right, that this whole line of cases has gone off along the wrong track quite a while ago. So, I mean, the notion that this form of relief is available in deportation proceedings is long settled. It's the premise of this Court's decision in St. Cyr. The agency has never undermined it or suggested that it was going to retreat from it. No party before this Court is suggesting that St. Cyr should have been overruled on that basis. And I think it's very clear that Congress, after the relief had been extended to deportation proceedings, enacted provisions in 1990 and 1996 that would have no operative effect if relief was not available in deportation. Kennedy, a lot of the statutory changes and the policies of the INS date back to, was it the Second Circuit's case in Francis, which talked about the equal protection component of the two classes comprised of those in exclusion proceedings and those in what were then called deportation proceedings. Do we just accept that? It seems to me that that whole equal protection rationale is quite doubtful. Well, there are two responses to that, Justice Kennedy. The first is the agency has accepted that in matter of Silva as a correct interpretation of the statute, and that has been on the books for 35 years now, approximately, and Congress has never suggested any disapproval of it. Rather, on the contrary, it has assumed that that is the law, and that's after the Solicitor General refused to seek certiorari of that decision. The comparison also was not between people in exclusion and people in deportation. It was between two. Kennedy, so if we thought that they had gone down the wrong path originally, there's nothing we can do about it, and we just say we're in this wilderness and we can't get out? I think, Justice Kennedy, Congress at this point has not only acquiesced, but indicated its understanding of the way that the agency has applied the law. And honestly, I think this is a question for the government, because the agency has never suggested that there was any basis for retreating from that position at this late date. Unless the Court has further questions on retroactivity, I would move quickly to our substantive position, which is that even without regard to retroactivity, the Blake rule is arbitrary and capricious. And there are two basic reasons for that. First, that it rests on improper factors, and, second, that it leads to results that the BIA itself has disavowed. First of all, Congress has never suggested that the words that it chooses in deportation provisions are somehow a key to eligibility for Section 212c relief. And yet that is largely everything that the Board relied on in Blake, was a comparison of the choice of words in deportation provisions to the choice of words in exclusion provisions. But the provisions of the deportation statute are not some enigmatic code from which the BIA can discern Section 212c eligibility. They determine who is deportable, but they have nothing to say about who is eligible for Section 212c. Section 212c eligibility turns on whether you are inadmissible. That's what Section 212c by its terms refers to. And that's driven home, I believe, by the addition of the crime of violence language in 1990 as a basis for deportation. Aggravated felonies were added in 1990 at a time when it's, I believe, clear that most of them, if not all of them, were already bases for exclusion. So there was no need for Congress to say crimes of violence are excludable. They already were, because they were crimes involving moral turpitude. It would have been redundant to put the same words in the exclusion statute. Congress didn't do it. Congress simply wanted to make clear that these people were now going to be deportable based on the length of their sentence. What about the comparability of the crime involved in St. Cyr? That was a drug offense. Does the inadmissibility criterion, does that accord with the one for deportation? Yes, it does, Justice Ginsburg, because Mr. St. Cyr would have been both deportable and excludable for his offense. So that's the logic. So there the linguistic comparison works, right? Well, the board in Blake concluded that that was, that the linguistic comparison worked there so that it did not have to find itself at odds with this Court's decision in St. Cyr. That's true. But when the court, when the board originally made that decision in matter of Mesa, they didn't just look to the linguistic comparison. I agree that if there's a perfect linguistic match, then you might not need to go to look at the conviction, because someone who falls under one will necessarily fall under the other. But just because Congress uses different words in the deportation subsection that's asserted against a particular alien doesn't mean that the analysis stops there, because the conviction might well make the person excludable such that the application that they're able to file in deportation proceedings should give them the same relief as they would have in exclusion proceedings. So what happened in 1990 when crime of violence was added, according to the government, is that that was a radical change in Section 212c eligibility, stealthily and silently, because, of course, while Congress was amending 212c at that time, saying it was no longer available to deportable aliens who didn't show up for certain hearings and no longer available for aggravated felons who were deportable who had served more than 5 years in prison, yet it said nothing, suggesting that people who had committed aggravated felony crimes of violence were all of a sudden ineligible for Section 212c relief, even though it could have said that. The notion that one can infer or decode those provisions as shutting out Section 212c relief for this group of people silently, even though the overlap is perfect, if not near perfect, is we would submit simply unreasonable. The arbitrariness comes through in another way, which is that the government says that it has an interest in treating people in deportation proceedings less favorably, if you will, than people in exclusion proceedings. Do you dispute that broad premise that the government could develop a system which treated those two groups differently? That is not the way that the agency has ever treated permanent resident aliens. In fact, if that is the government's position, that is clearly a change in the law. The BIA said, going back to Silva, but in matter of AA, a 1992 published decision, that it is the long, the quote, long-established view of the Attorney General and the Federal Courts that an application for Section 212c relief filed in the context of deportation proceedings is equivalent to one made at the time an alien physically seeks admission into the United States. That's footnote 22 of matter of AA. So the agency's longstanding position, at least since Silva, has been that there is no difference between an application filed in deportation and one filed in exclusion, and that I think is consistent with what Attorney General Thornburg said in matter of Hernandez-Casillas. I'd submit one last point, which is the arbitrariness of what the BIA is doing shines through in that it has led to consequences that the BIA has itself repudiated as inconsistent with the statute. And the most salient example is the one that the government admits on page 26 of its brief, which is that the possibility that someone could get a waiver of inadmissibility one day for a given conviction and then be deported the next day for the very same conviction. Now, the BIA in 1956 in matter of GA said that was clearly repugnant. Now, the agency cannot have it both ways. The statute cannot mean X and not X. If it does, that is the hallmark of arbitrariness. The government's only answer, as far as I know, is that it will exercise its prosecutorial discretion to avoid that situation. I would submit that an agency cannot defend an arbitrary policy by saying that it is going to be enforced in a capricious way and that it will all balance out in the end. This Court should evaluate the Blake rule on its own merits, and if it is arbitrary as it clearly is, it should be disapproved. The other indication of arbitrariness is that the Blake rule revives the distinction between deportable aliens, Justice Kennedy, who traveled abroad and returned, and other deportable aliens who did not travel abroad and returned. Kagan. Kagan. The government says that's not the case. The government says that it does not treat those two groups differently. Do you have any evidence to the contrary? Yes, Justice Kagan. The evidence is the Attorney General's position, opinion in Hernandez-Casillas. The government's only citation for that is a footnote in Wadud, arguing that supposedly the non-proton doctrine is not still good law. But five years after Wadud, in Hernandez-Casillas, Attorney General Thornburg was asked by the INS to disapprove matter of L, Justice Jackson's decision as Attorney General and matter of G.A. and the non-proton doctrine that is set out in those decisions, and he expressly declined to do so. On the contrary, he reaffirmed that in cases where the alien has left and come back, the Attorney General and the Board have permitted the alien to raise any claim for discretionary relief that the alien could otherwise have raised had he been excluded. So non-proton clearly is still good law, and the government seemed to agree with that as recently as its brief in opposition to certiorari. As for the travel distinction itself, the government, to its credit, does not try to defend it, and with good reason. The agency in Silva has long held that there is no distinction or no rational way to distinguish, under the statute, between people who are in deportation proceedings who have left and come back and people in deportations who have not. Unless the Court has further questions, I would reserve the remainder of my time. Thank you, counsel. Mr. Gannon. Mr. Chief Justice, and may it please the Court. Petitioner does not dispute that some comparability analysis must be applied to prevent relief under former section 212C from being extended to certain grounds of deportability. But his methodology of asking whether his offense could have made him excludable is inconsistent with established cases from the Board that long predated the ones at issue here involving firearms offenses and visa fraud. Justice Scalia brought up the case in Wadud. That was a visa fraud case. It was a prosecution under 18 U.S.C. 1546. That's a provision that penalizes fraudulent and other misuse of visas and other immigration documents. It's a very broad criminal provision. It's long been a ground of deportability. And at the time, the alien argued that this is fraud. It's a crime involving moral turpitude, and therefore I would be subject to exclusion. In Wadud, the Board rejected that analysis. Breyer, it's true, but it may save a little time, at least, if I were in an arcane area of the law, to me. It was created by Robert Jackson, Attorney General, and by Thornburg, Attorney General. And if we're starting with that, what that says is we have a list over here of excludable things, and we have a list of deportable things. And if you're deported for a reason that shows up on that first list, then the AG could waive it. That's basically the outline I have. And also I have, which isn't quite right, that in that first list there's something called, I have big letters, CIMT or something, crime of moral turpitude. And all the things on this second list, the big issue is, is it a crime of moral turpitude. Now, as I look through the opinions, this is what I got out of them, and this is tentative. I got out, just as you say, there are two things in the second list which are not crimes of moral turpitude. They consist of illegal entry crimes and gun crimes. And there are special reasons from the first and the second is debatable, but they've been consistent in that. Then there are things that are on both lists. They are crime of moral turpitude. I counted at least eight cases saying, for example, rape, burglary, manslaughter, second-degree robbery, indecency with a child, and probably some others are all crimes of moral turpitude, so it clicks in. Okay? Then I find Blake, and Blake says sexual abuse of a minor is not a crime of moral turpitude. That's a little surprising. But it gives us a reason because, and this was the problem here, it talks about there has to be substantial – there has to be similar language in the two lists. I don't know where that one came from. That's certainly not been in the earlier cases. And now we have this case, which is voluntary manslaughter. I would have thought voluntary manslaughter is right at the heart of the list that they said the things are crimes of moral turpitude and not like visa crimes or gun crimes, if I had read the cases. So where do I end up? Well, what I end up with this, and this is what I would like you to reply to. Justice Brandeis once said something like, we have to know before we can say whether an agency opinion is right or wrong what they are talking about. I felt perplexity after I had read through these decisions. In other words, I don't understand it. So I would like you to explain to me why this all fits together and how, if you can do that. I couldn't get that clear explanation from the brief, and I suspect it is not your fault. Well, I agree that the history and the law here is relatively complicated and it has had a lot of moving pieces over the years. But I think that the Board has been very consistent, especially beginning in the 1984 Wadu decision that was picked up in the Jimenez-Santillano decision and also in firearms offenses. Justice Breyer, you talked about the fact that the Board had been consistent in firearms offenses. And Petitioner does not dispute that firearms offenses are ones that do not have a comparison. Breyer, the one that was worrying me, rape, burglary, manslaughter, second-degree robbery, indecency with a child, all those cases are about seven-rated. If I could go back for a second to firearms offenses, the Board there has continued to say that there is no comparable ground for firearms offenses, even if your firearms offense would be something that could have been considered a crime involving moral turpitude. If you look at the Board's 1992 decision in Montenegro, that was a case that was assault with a firearm. And so it wasn't merely possession of a handgun or an automatic weapon or a sawed-off shotgun. Is there any aggravated felony, crime of violence, that is not a crime involving moral turpitude? Yes. Justice Ginsburg, the Board pointed out in the Brieva-Perez decision that minor but relatively common crimes of violence, including simple assault and burglary, generally aren't considered to be crimes involving moral turpitude. And the reply brief, Petitioner points to a Board opinion in Lussaint saying that the record is muddled on burglary. But that opinion only showed that residential burglary isn't a crime involving moral turpitude. And a crime of violence, in the definition, is one that involves the use of physical force against person or property of another. And so it doesn't need to be aggravated in any other sense. It doesn't need to be a. Was Judelung's crime a crime involving violence? Yes, it was a crime. I mean, a crime of moral turpitude. Yes, it was. But what I'm trying to say, Justice Ginsburg, is that Petitioner's approach of looking to the conviction is inconsistent with the Board's repeated methodology. Don't look to the conviction. That may be his approach. My approach is look to the category. And, Justice Breyer. And the category here is not, you know, the category isn't crime. The category is what kind of a crime. And this is a crime of violence in the statute, or if you look at what was charged, it's called voluntary manslaughter. Either way, I would think those categories, as categories, fall within crime of moral turpitude. Well, but the category that's relevant is the crime of violence.  And the category that's relevant is the crime of voluntary manslaughter. So it's a category of violence that satisfies the statutory definition in 18 U.S.C. 68. But you're not – you're not. If I'm understanding. Can I hear his answer? I'm – I was very interested in the question. It seemed to make a good point. Well, if I could finish up on the firearms analogy, I think that this is responsive, Justice Breyer, to your point about looking at the category, and that in Montenegro the Board specifically concluded that this offense, assault with a firearm, it's a firearms offense, but because we've already concluded that as a categorical matter, firearms offenses aren't on the list of exclusion crimes, we don't care and we're not going to ask ourselves whether it could have been a crime involving moral turpitude, the Board applied that same reasoning again in a 1995 opinion in Espinoza. We quote all of these opinions on page 41 of our brief. And so in these two categories, firearms offenses and visa fraud offenses, both of which could often involve moral turpitude on an individual – in any individual case, that such offenses could involve moral turpitude, just like a crime of violence, may well involve moral turpitude, and yet the Board concluded that because as a categorical matter, this is not comparable to any ground of exclusion, it was going to say that it was not going to extend this – this relief that Montenegro has. Let's let Justice Sotomayor jump in now with her question. SOTOMAYOR. I go back to Justice Breyer's question. What you just said made logical sense. The category of gun possession doesn't go in. Visa fraud doesn't become a crime of moral turpitude. But we have cases that have said, generically, manslaughter, which involves violence, is a crime of moral turpitude. Others have qualified sexual abuse of a minor. I don't know of anyone who would think that that – that category of crimes, whether you call it decency, touching, or we've already said touching alone may not qualify. But my point is, you now are saying, I think, and correct me if I'm wrong, that aggravated violent felons is an entire category. And anything that falls under that label can't be a ground of exclusion. That's how I read your categorical comparison now. No. The board has made it clear from as early as the Meza decision that it would look into the specific category within the definition of aggravated felony. All right. So now why is manslaughter not a crime of moral turpitude? Because that's not the category in the aggravated felony definition that we're talking about. What we're talking about is crimes of violence. That's the category. And so – But, Mr. Gannon, suppose this. Suppose that on the exclusion side you have this category of crimes of moral turpitude. And suppose on the deportation side, which I think is right, you have a category called crimes of violence and you also have a category called crimes of moral turpitude. There's a time limit on that. We do have that category here. That's right. But suppose that you – the government could have slotted manslaughter into either of those categories on the deportation side. And I understand that there's a dispute about whether it could have, but let's suppose it could have. So if manslaughter is categorized on the deportation side as a crime of violence, you say it doesn't match with the category on the exclusion side. But if the same crime is categorized in a different way by the government, then it does match on the exclusion side. So what sense does that make, that the government's decision about how to categorize a given offense on the deportation side is going to determine whether a person gets relief? Well, I think that there's no dispute about that between us and Petitioner. If somebody had a firearms offense, it could have been charged either way. The Petitioner just says we look to manslaughter and we ask whether that qualifies a person for relief on the exclusion side. And what I'm trying to say is – But you're saying, no, first we have to put manslaughter in a category on the deportation side, and then we have to match that to the category on the exclusion side. And what I'm asking you is kind of what sense does that make? Doesn't everything depend on which category you put manslaughter into? Well, what it – the reason it makes sense is because the statute only provides for relief from grounds of inadmissibility or exclusion. By its terms – You are so far from the statute, Mr. Gannon. You can't even tell what's closer to the statute. I mean, you are miles away from the statute. Well, the way this doctrine developed, Justice Kagan, is that it developed in the context where the Board recognized that the statute only applied to waiver of grounds of excludability. And it extended that to deportation cases when it was on the basis of the same grounds that could have been presented in an exclusion proceeding. And so that's all we're trying to do here, is to continue without – But your position means that it's up to the agency, up to the person who makes the charge, because take Mr. Judilon. He could have been categorized as deportable because he committed a crime involving moral turpitude, or he could have been categorized as somebody who committed an aggravated felony. It is then totally in the hands of the person who is making the charge whether there will be a match or not. The reason why that's so is because the thing that is going to be waived at the end of the proceeding is the ground of deportation. And so if the ground of deportation is for an aggravated felony, a crime of violence, then it needs to be one for which there's 212c eligibility. The same would be true if it were a firearm offense. If it were. If the officer labels the manslaughter, in this case, a crime involving moral turpitude, then there's a match. And if he labels it aggravated felony, crime of violence, then there's no match. So it's up to the charger whether there will be this match or not. That's true. It's also true in the firearms offense cases and the visa fraud offense cases, because those are all instances in which, depending on the circumstance of the offense and depending upon what it was charged, the Board has concluded that the 1546 offense is divisible. Some of those are crimes involving moral turpitude, some of them are not. And I think, and so.             Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. And I think that this is not only consistent with the history, it's consistent with the text of the regulation that Petitioner is invoking here, which makes it clear that what is being waived is a ground of exclusion or deportability or removability. And so what's relevant is whether the ground of removability is the aggravated felony, crime of violence ground or the crime involving moral turpitude ground. Depending on which ground it is, that's what he's seeking relief for. Ginsburg. Then you have to say, yes, you can have somebody who would get a waiver of inadmissibility for a crime and the very next day be put in deportation without any waiver for that same crime. Well, we have no cases in which that has happened. And the cases in which the board said that that result would be clearly repugnant were ones in which there was a comparable ground. The board was saying that if you get 212c relief on the boundaries. Well, I'm giving you these categories. Pardon? These categories. No. There are no cases that address that principle in the context where there is no comparable ground. And if I could just make one point about this claim of Petitioner's in his reply brief that he could have been subject to a charge of deportability on the basis of a crime involving moral turpitude, I would caution the Court against relying on that for two reasons, one factual and one legal. One is that there is no factual basis in the administrative record to talk about this 1987 trip to the Philippines. We do have evidence from outside the record that makes us believe that it occurred, but the statutes that provides for judicial review here of the order of removability in 8 U.S.C. 1252, B4A, specifically says that the determination needs to be made on the basis of the administrative record, and the only evidence in the record about that trip is actually a statement from Petitioner's mother that says that it occurred in 1989, the year after the crime. But even assuming that the trip happened, and as I said, we do believe on the basis of evidence outside the record that it did occur, there is a legal reason why I would caution the Court against assuming that that means the Petitioner could have been deportable for a crime involving moral turpitude, and that's the so-called Flutie doctrine under this Court's 1963 decision in Roseburg against Flutie, which is actually relevant to a case on which you granted certiorari a couple of weeks ago. This Court concluded that if an LPR takes a brief, casual, and innocent trip outside the country and returns to the United States, that will not trigger an entry upon his return to the United States. And so I think it's very likely that under circuit precedent in 1989, when Petitioner was pleading guilty to his voluntary manslaughter charge, he wouldn't have had any reason to think that he was doing so within 5 years of when he committed, when he entered the country for purposes of the statute. I think it's also the case that the Petitioner's claim is not true. Breyer. Can we go back to a second on this? It's very interesting. Suppose I say, okay, I concede, I'd only do it for the sake of this question. You're absolutely right in your categorization. The right category is crime of violence. And then I look at the statute, which is 8 U.S.C. 11-0143, which you probably know by heart, and I look at the definition of grunt crimes, and I look at crime of violence. My non-schooled reaction is, well, gun crimes, I can see why they said that wasn't really a crime of moral turpitude, because there are a lot of registration requirements, there are all kinds of different things that drug dealer, gun dealers have to do, and you could commit that crime in various ways that don't involve moral turpitude. I can understand that, sort of. At least I can see how somebody else might have understood it that way. Now, I think crimes of violence, I say, hey, I'm having trouble here. Why don't you try to list a few crimes of violence that when they come into the country, you're going to say, oh, that wasn't a crime of moral turpitude. And by the way, I'm not asking you to list specific examples. I'm asking you to list categories. List categories of crimes of violence that when the person comes in, you're going to say, hmm, no moral turpitude there. That the chief examples are the ones that the Board gives in the Brieva-Perez opinion, which are simple assaults, which has to do with violence. That's not a crime of – that's not a moral turpitude, simple assault, you go and just hit somebody. That's correct. It is not a crime involving moral turpitude. Neither is non-residential burglary, which involves force against property, which would, therefore, satisfy the definition. This is an opinion that the Board has. Burglary isn't burglary where it might be an occupied building? If it were an occupied building, if it were a dwelling, the Burglary. Well, no, no, a house, a warehouse. I'm being a little quibbling now. Well, and of course, my basic concern is. In the Ninth Circuit, a burglary of a residential dwelling that's occupied is not a crime involving moral turpitude. Oh, really? Okay. In a case that's cited in the concurring opinion. So there are some. There are some. There are certainly a few. This is a little odd, but what I'm afraid of. They would tend to be minor, minor. Minor. Okay. But what I'm afraid of is this, that once you put this in your category, that you say crimes of violence are not crimes of moral turpitude, then to a large extent you have said goodbye, Justice or Attorney General Robert Jackson. I don't. You're saying goodbye to Jackson and Thornburg because you have driven such a wedge between these two statutes that there's hardly anybody who would be able to qualify for the Jackson-Thornburg approach to this statute. I overstate slightly, but you see my point. I see your point, Justice Breyer, and if you look at all of the cases that predate the era that we're talking about here, they all, almost all, involve two categories of offenses. Drug trafficking or controlled substance offenses and crimes involving moral turpitude, things that were actually charged under the ground of deportation for crimes involving moral turpitude. And here, Congress added aggravated felonies to the deportation side of the ledger but didn't add it to the exclusion side of the ledger. And then it repeatedly expanded the definition of aggravated felony between 1988 and 1996 in ways that made these offenses treatable in different ways for purposes of deportation than they were for exclusion. And as a category of offenses, there's only one category now, aggravated violent felony. That's the only category you're looking at. It doesn't matter in your judgment. That is your test. If it qualifies as an aggravated violent felon, it cannot be a crime of moral turpitude. I disagree with the fact that that's the category we're looking at. We're looking inside the definition of aggravated felony to the particular ground, which is crimes of violence. And then what we are saying is that the analysis needs to be done at a categorical level, and the Board has said that you cannot get a 212c waiver from a ground of deportability unless that ground of deportability is substantially equivalent to a waivable ground of exclusion. Sotomayor, let's go back to a concrete example following Justice Ginsburg's example. Someone is charged with a crime of violence, voluntary manslaughter, and would an officer at the airport say, you're not admittable, that's a crime involving moral turpitude could the officer say that? Yes, the officer could say that. And could he then waive that ground under 212c? Generally, yes. I mean, there's a third. Now, let's assume he did, that he waives that crime of moral turpitude. Would the government now put that individual in deportation and say, this voluntary manslaughter doesn't meet the statutory counterpart test, so for that very crime, we're going to deport you, even though we let you in, because it's a crime involving violence? We don't have any examples like that. Would you? Can you? Is that where your test leads you? Well, ultimately, even the durability of the 212c waiver wouldn't necessarily have protected somebody against a second seat. Ginsburg. In your brief, I thought you conceded that. We did. That just the example that Justice Sotomayor gave, somebody is declared inadmissible because it's a crime, this manslaughter or aggravated felony, crime of violence, is, on the admissibility side, a crime involving moral turpitude. So he's allowed in. And then he's in, and he's declared deportable, and he can't get a waiver because there's no analog. I thought your brief said, yes, that's the consequence of our argument. However, prosecutors would not seek deportation if inadmissibility had been waived. Well, the brief did say that this is hypothetically possible. I'm aware of no instances in which it's happened, and we don't have a board decision about what the effect of the earlier waiver would be on a non-comparable ground in the subsequent deportation proceeding. And I do think, however, that regardless of the prosecutorial discretion point here, even if the board were to conclude that the 212c waiver carried across and would prevent this alien from being deportable in a subsequent proceeding, an important purpose would still be served by encouraging the alien to get himself into exclusion proceedings at the beginning, because that is what several courts have concluded would be a rational basis for differential treatment in encouraging aliens to seek 212c waivers in the exclusion context. Congress, when it adopted the aggravated felony definition and repeatedly expanded it, it was concerned about criminal aliens in this country and ways to get them out of the country. And so to the extent that 212c relief still is available for certain LPRs who meet certain threshold criteria and are being deported on the basis of crimes that would have made them inadmissible, if an alien then wants to seek 212c relief, he can get himself into an exclusion proceeding, or he can seek advanced parole on the I-191 form that Petitioner reprints. You're also telling me that I didn't know this. I learned something in every argument, that if we have Jack the cat burglar who was burgling dozens of office buildings and abroad and assaults people and hits them over the head or whatever with his fist, that we have no way of excluding that person should he try. I've heard criticisms of our immigration policy, but this seems surprising to me, that we have no way of excluding that person who is filled with a simple burglary of office buildings and assaults. Well, there was a separate ground, which is two crimes, any two criminal cases. It's only done at once. We have to automate. It's only done at once. Then it may well be that it wouldn't qualify. But the Board has repeatedly declined to consider whether such a crime, which would be — could potentially be a ground for exclusion, would automatically guarantee that they — that the alien could receive a waiver of any ground of deportability based on the same conviction. And when my friend — They haven't decided. No, I'm saying that the Board repeatedly declined to apply this analysis in the context of firearms offenses and visa fraud offenses where aliens said, my offense is a crime involving moral turpitude. I could have been charged with being — I could have been excluded on the basis of my visa fraud offense or my assault with a firearm, because assault with a firearm is a crime involving moral turpitude. Could I ask just a practical question? Does this issue go away finally when there are no more sincere people? Meaning, is there any — there's no 12C anymore. Well, there's a new provision, cancellation of removal, which indisputably just simply is unavailable to anyone with an aggravated felony conviction. Exactly. And so really the issue that we have at the moment is whether your decision to affect what has happened now in the past, to do what Congress has done moving forward, and to avoid St. Cyr, is just to say if it's an aggravated crime of violence, it just doesn't qualify anymore. That's what you're doing. We're not — you're not giving 212C to anybody anymore. Well, we're — we're giving it to aliens like this, aliens who — who have older convictions, pre-1996, guilty pleas. But you're just saying if they're aggravated — if they've committed an aggravated crime of violence, they're not getting it anymore. That — that is if it's a crime that was — a conviction that occurred after 212C was repealed. So, for instance, in this case, if on remand the Board considers one of the other charged grounds of — But this whole thing goes away once all the St. Cyr people have — Yes, because 212C only lives on by virtue of St. Cyr right now. And I — but I do want to stress that — that this — I think Justice Kagan was correct to point out that this was clarifying a previous state of the law. We believe that there were very clear principles in the cases that are cited on page 41 of our brief that the Board had refused to do the analysis on — on a conviction level as opposed to a categorical level. And my friend keeps quoting Attorney General Thornburg's opinion and Hernandez-Casillas for his re-adoption of the nunc pro tunc doctrine. But I would like to point out that the Attorney General there made it very clear in his holding that he was reaffirming the statutory counterpart doctrine as it existed at the time. And at page 291 of his opinion, he says that he rejects the Board's attempt to extend 212C to, quote, grounds of deportation that are not analogous to the grounds for exclusion listed in section 212C. But he also said that there are only two grounds for deportation that have no analog in the grounds for exclusion, entry without inspection and firearm convictions. That is what footnote 4 of the opinion says. That's clearly an under-inclusive list because it doesn't include visa fraud offenses, which had already been recognized in Wadood as being a category that did not have a comparable ground. And that was reaffirmed later in the Jimenez-Santillano opinion. My friend quotes the Jimenez-Santillano opinion in his reply brief for the proposition that Wadood was really about the facts. This was his answer to you, Justice Scalia. But if you look at the Jimenez summary of what actually happened in Wadood, the other half of the sentence that's being quoted there says the Board in Wadood, quote, observed that we did not need to decide whether Respondent's 1546 offense was a crime involving moral turpitude because no ground of inadmissibility enumerated in section 212A of the Act was comparable to section 1546. And so the Board in Wadood, quote, observed that we did not need to decide whether Respondent's 1546 offense was a crime involving moral turpitude because no ground of inadmissibility enumerated in section 212A of the Act was comparable to section 1546.   of inadmissibility enumerated in section 212A of the Act was comparable to section 1546. Alito, I don't have a good estimate of that because we don't know how many offenders with pre-1996 guilty pleas will end up being picked up by immigration authorities and charged under these circumstances. You know, Petitioner is somebody who at the time he committed his offense wasn't even an aggravated felon. It's only by virtue of the retroactive applicability of the definition that he became an aggravated felon. And so that makes the sort of sincere question about his reliance a bit perplexing here. At the time when he was pleading guilty to voluntary manslaughter, because it wasn't within five years of entry, it wouldn't have been a crime involving moral turpitude and therefore it wouldn't have been a ground for deportability. And it also was not yet an aggravated felony. So he had no reason to think he was pleading guilty. To a deportable offense. Alito, do you know how many times this has come up in cases over, let's say, the past five years? I don't know how many times. All of the cases that are cited in Petitioner's brief and the amicus brief, there is a gap between 1996 and about 2003 because of the repeal of 212C and St. Cyr and the regulations. There was about a seven-month period after the regulations before the Board decided Blake and Brieva Perez. There are on the order of several hundred 212C applications that are being granted by the Board each year right now, but that's with a backlog of cases, some of which have been pending for an incredibly long time. You said, Mr. Gannon, that the government no longer treats people differently depending on whether they have left the country and returned or haven't left at all. Mr. Fleming points out that you said the opposite in your brief opposing Surratt. I appreciate your chance to let me clarify, Justice Kagan. In our brief in opposition, we stated that an alien could avoid the statutory counterpart rule by leaving the country. That meant that by getting himself into an exclusion proceeding, the statutory counterpart rule then would not be applicable. It didn't mean that had he left the country, come back, evaded an exclusion proceeding and been put in a subsequent deportation proceeding, that the statutory counterpart rule wouldn't apply. Thank you, Mr. Gannon. Mr. Fleming, you have six minutes remaining. Thank you, Mr. Chief Justice. I would begin simply by following up on the questions that Justices Ginsburg and Kagan asked to my brother about whether my client could have been charged as deportable with his conviction treated as a crime involving moral turpitude. In fact, he was. If one looks at the decisions in the appendix to the petition for certiorari, specifically at page 11A, it's clear that his conviction is asserted not only as an assertion, but also as a crime involving moral turpitude, and the immigration judge found that he was, in fact, deportable with that conviction forming a crime involving moral turpitude. So there's no dispute here that Mr. Judelang's conviction falls into both categories. On the issue of the factual basis of my client's deportability at the time of the plea, Mr. Gannon is correct. There's nothing in the administrative record that says that, and that is why this Court typically does not countenance arguments based on the facts by the Respondents that are raised only in the brief on the merits. If anyone had suggested that this was an issue on which a factual record needed to be developed, we could have done it. It would not have been hard. I also want to comment on one point that Mr. Gannon made, which is that the thing that is waived under 212c is a ground of deportation. That's not correct. Section 212c provides relief from inadmissibility. It says that clearly in its text. That is how the regulations and the decisions have always treated it. The form that immigrants are instructed to fill out, Form I-191, which is appended to our blue brief, specifically says, State the reasons you may be inadmissible to the United States. If a waiver of inadmissibility is granted, that waiver protects the immigrant from subsequent deportation based on the same conviction. That is the language of matter of GA, which the government itself exerts in its brief, and Justice Ginsburg is correct. That is, they admit that a waiver is durable in that sense. If it is granted to waive inadmissibility, it protects the alien from deportation on any deportation subsection based on that same conviction. I thought it was telling, Justice Breyer, in reaction to your question, which was seeking an explanation of how this scheme is reasonable, the answer that counsel for the government gave was that the BIA has been consistent with firearms and visa fraud cases. But there was no explanation as to how the Blake rule, as it is now drawn, is in any way a reasonable application of the law. I would submit for the reasons that Your Honor pointed out, which is that we have a number of, whether one calls them convictions or whether one calls them categories of crimes, voluntary manslaughter, aggravated burglary. Recall that we are talking about aggravated felony crimes of violence. I would recognize that if we talk about third-degree burglary, which could be charged on the basis of someone opening an unlocked door and walking across the threshold, maybe that's not a crime involving moral turpitude, but it is probably not an aggravated felony crime of violence either, certainly not after this Court's decision in Leocal. So I would submit that the government has not identified a crime that would be both an aggravated felony crime of violence and yet not a crime involving moral turpitude. The overlap is, I would submit, total, and even if it's not total, that is not the argument, because the Board itself has said you don't need a perfect match, you just need substantial overlap. And the overlap is at the very least substantial, if not complete. The crime that was charged in Brieva Pérez itself, unauthorized use of a vehicle under Texas law, has subsequently been held by the Fifth Circuit not to be an aggravated felony at all. So Brieva Pérez on its own terms is no longer good law, as we point out in our reply brief. The interest that Mr. Gannon asserted at one point about getting immigrants to put themselves into exclusion proceedings, this is a very important point. The agency has never suggested that that is the way that it runs the railroad. On the contrary, it has expressly said the opposite. It does not matter whether the 212c application is filed in exclusion proceedings, in deportation proceedings, or outside of proceedings entirely by sending a letter to the district director saying, please give me an advance waiver before I travel abroad. The regulations make very clear and the decisions make very clear, I quoted Matter of A.A. in my opening argument, that an application is identical and the relief that is given is identical, regardless of the proceedings. For Mr. Gannon to stand up and say that the agency is now creating a sharp distinction, saying that applications filed in exclusion are omnipotent and applications filed in deportation proceedings are meaningless, is a clear change in the law and it is unfair to apply it against immigrants like Mr. Judelang and others who relied on the availability of Section 212c as protection from removal, whether exclusion or deportation, in the future when they pled guilty. Justice Sotomayor, your question about how many people are involved here, it is difficult to identify specific numbers because very often these cases are decided at the immigration judge level that are not reported. In the appendix to our petition for certiorari, we identified over 160 people who have been subject, who have suffered under the Blake rule since Blake was decided in 2005. And part of the problem is that we are talking about a group of people who have been in the country for a long time, whose convictions are dated, who are law-abiding, who are reformed, and may only come to the attention of the authorities subsequently through perfectly law-abiding conduct, such as applying for naturalization or renewing a green card. So they would be Sotomayor, if they weren't law-abiding, they would have committed a new felony that would render them ineligible. That would potentially subject them to removal, exactly. Now, and there might be other forms of relief, as Mr. Gannon mentioned, but that's certainly right. But a good number of the people here who have been harmed by the Blake rule are people who are the most deserving candidates for relief. And the NIJC brief, I think, sets that out quite convincingly. We would submit that the only reasonable approach here is the one that the agency took for years under Mesa and under the eight decisions that Justice Breyer referenced, where the immigration judges knew the rule, they applied it, they looked at the conviction, they figured out whether the conviction would trigger excludability. If it did, then the alien was entitled to apply on the same basis and with the same effect as if he had found himself in exclusion proceedings. The judgment should be reversed and Mr. Judelang should be entitled to file his application for adjudication on the merits. Roberts.